UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-10327-RGS

JOHN MESCHINO,

v.

FRAZIER INDUSTRIAL COMPANY,

MEMORANDUM AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT

August 1, 2016

STEARNS, D.J.

In January of 2015, John Meschino sued his employer, Frazier Industrial Company, in Suffolk Superior Court, to recover allegedly late-paid and unpaid sales commissions. Meschino claimed violations of the Massachusetts Wage Act, Gen. Laws. ch. 149, § 148 (Count I); breach of contract (Count II); and unjust enrichment (Count III). Frazier terminated Meschino in July of 2015, precipitating additional claims for tortious interference with advantageous business relationships (Count V), and retaliatory termination in violation of Mass. Gen. Laws. ch. 149, § 148A (Count IV). (The tortious interference claim has since been withdrawn). Frazier removed the case to this court in February of 2015, based on diversity of citizenship. *See* 28 U.S.C. § 1332. Before the court are cross-motions for

summary judgment. Oral argument on the motions was heard on July 6, 2016.

## BACKGROUND

Frazier manufactures and sells structural steel storage rack systems. It owns manufacturing facilities and sales offices throughout the United States. Meschino served as Frazier's New England District Sales Manager from July of 2005 to July of 2015. His employment was at-will. Frazier is headquartered in New Jersey, while Meschino worked from his home in Hull, Massachusetts. Meschino signed his original Employment Agreement with Frazier in July of 2005, and signed an updated Agreement in October of 2012. *See* Oliver Aff. (Dkt. #117, Exs. A, B).

Meschino's Agreement exhorted him to "operate as a small company" and promised that "[f]or sales up to $5 Million a commission on gross profit of 10% will be paid." Pl.'s Statement of Facts (PSOF) (Dkt. #120, Ex. 1 at 1, 2). The percentage paid in commissions would rise commensurate with increases in gross sales as follows.

| Sales up to and **including:** | Commission % Paid |
|---|---|
| $5,000,000 | 10% |
| $10,000,000 | 11% |
| $15,000,000 | 12% |
| > $15,000,000 | 13% |

*Id.* at 2.  The Agreement stated that the "[c]ommission for project managed jobs will be calculated at the transmitted margin and adjusted for the final budgeted margin when it is available.  For jobs approved [by Meschino's supervisors] with margins under 10% . . . ¼ of 1% of the total sell will be paid as a commission."  *Id.*  Frazier provided Meschino with quarterly commission "[s]napshot[s]" that forecast his potential earnings.  *Id.*  The parties dispute the reliability of these snapshots.

According to the Agreement, commission payments would vest as follows.

> Commission on a quarters' jobs will be first eligible to be paid at the latest by 4½ months after the quarter the sale is booked, ([f]or example: 1st quarter jobs will first be eligible for payment by no later than August 15th.)  Fifty percent (50%) of the commission as calculated in the quarter booked will be paid when a job is 50% or more paid by the customer.  When the job is paid in full the entire commission will be paid.  Any jobs not paid in full when the 1st eligible quarter for commission payment has passed while [sic] remain as an eligible commission in the following quarter until the job has passed 50% or 100% paid.

*Id.*  The Agreement finally stipulated that "[i]n the event of an error clearly attributable to the salesman, the company reserves the right to recover by deduction up to 25% of the cost caused by the error."  *Id.* at 3.

In 2014, Frazier encountered severe difficulties and delays with contracts sold by Meschino to Fresenius Medical Care (Fresenius) and Maines Paper & Food Service (Maines).  As might be expected, the parties'

3

explanations for the discord diametrically differ. Meschino claims that he sold a racking system to Fresenius that later proved technically faulty. Frazier's management then switched third-party providers, delaying completion of a perfected system and forcing Fresenius to incur substantial storage costs. Frazier complains that Meschino should have investigated the problems with the racking system before finalizing the sale. Additionally, Frazier accuses Meschino of warranting the seismic safety of the racking system to Fresenius when he should have known that it was not compliant with California's Seismic Code. Because of the potential exposure to massive earthquake liability, Frazier was forced to redesign the project. Meschino insists that he never made any such guarantee and that Frazier had agreed to excuse him from any liability for the costs of the redesign.

With respect to the Maines projects, Frazier contends that Meschino failed to obtain waivers from Maines stipulating that Frazier would not be responsible for the work of third parties. Frazier then suspended work until the waivers were signed. The delay forced Frazier to rush the job to an imperfect finish, leaving Maines dissatisfied with the final product. Meschino asserts that waivers were rarely obtained from customers before on-site work began.

In July of 2014, Carlos Oliver, the President of Frazier, emailed Meschino to tell him that he would not be paid commissions on the Fresenius or Maines contracts and "[would] also be held financially responsible for costs incurred per [his] contract." PSOF, Ex. 6.  As justification, Frazier points to back charges and repair costs on both jobs that it alleges resulted in "extraordinary losses."  Def.'s Mem. at 5 (Dkt. #118).  In May of 2015, Frazier reported losses of $107,324.91 on the Maines projects and $88,190.52 on the Fresenius projects, totaled $195,515.43.  *See* PSOF, Ex. 9. After two subsequent revisions in December of 2015 and January of 2016, those alleged losses totaled $392,787.96.  *See id.*, Ex. 22.  Frazier estimates that the losses resulted in negative profit margins of -4.38% on the Maines projects and -10.81% on the Fresenius projects.  Def.'s Mem. at 2.

Because Meschino was not awarded commissions on the Maines and Fresenius contracts, Frazier deducted the losses from commissions Meschino had earned on other sales.  Frazier explained its calculations of Meschino's commissions earned and the deductions taken during the calendar year 2014 in a chart produced during litigation.  *See* FRAZ000111 (dated May 28, 2015).  Combining Frazier's figures with those set out by Meschino in his Statement of Facts, results in the following chart.

| Quarter/ Year | Latest Date First Eligible | Date Paid[1] | Commissions Earned | Commissions Withheld | Commissions Paid |
|---|---|---|---|---|---|
| Q1 2014 | 08/15/14 | 08/14/14 | $62,751.72 | $38,549.65 | $24,202.07 |
| Q2 2014 | 11/15/14 | 11/26/14 | $57,327.93 | $27,500.00 | $29,827.93 |
| Q3 2014 | 02/15/15 | 02/13/15 | $23,888.37 | ($16,846.65) | $40,735.02 |
| Q4 2014 | 05/15/15 | 05/18/15 | $19,197.40 | ($324.14) | $19,521.54 |
| **Total** | | | **$163,165.42** | **$48,878.86** | **$114,286.56** |

*Id.*[2]

Meschino received a $10,699.97 check for commissions earned in Q1 2015 on September 24, 2015, with no indicated withholdings. PSOF ¶ 41. Frazier also paid Meschino $10,680.95 for Q2 2015 on November 19, 2015, but without an explanatory statement. *Id.* ¶ 42. The parties dispute whether Meschino received a commission statement for Q3 2015. *Id.* ¶ 43. Meschino also claims that he is owed $6,725.62 in (adjusted) commissions on the Maines and Fresenius deals. *See id.* ¶ 45, Ex. 9 at 3.

To sum it all up: Meschino contends that in addition to the $6,725.62 in unpaid commissions, Frazier improperly deducted $48,878.86 from his earned commissions on other deals to offset 25% of the $195,515.43 losses Frazier claims to have incurred on the Maines and Fresenius projects.

---

[1] All payments are being held in escrow by the court, as Meschino has not accepted them.

[2] The over-payments to Meschino for Q3 and Q4 in 2014 compensated him for "mistaken deductions" that Frazier acknowledges having withheld from his Q1 and Q2 2014 earnings. See PSOF ¶¶ 25, 31, 36.

6

Frazier's position is that Meschino is not owed any commissions on the Maines and Fresenius projects "because of the losses and negative margins realized."  Def.'s Resp. to SOF (DRSOF) ¶ 26 (Dkt. #138).  Frazier acknowledges that "[the company] deducted from Meschino's [other, unrelated] eligible commissions for the errors on the Fresenius and Maines Paper Projects but . . . denies that any deductions were made from commissions that were 'due and payable.'" *Id.* ¶ 27.

Frazier contemplated firing Meschino in July of 2014, but instead imposed a 90-day period of probation, requiring that he attend additional training sessions.  In August of 2014, Meschino's lawyer wrote a demand letter to Frazier executives outlining Meschino's grievances.  Not surprisingly, the employment relationship deteriorated further.  At one point, according to Meschino, Dominick Iellimo, Frazier's Vice President of Sales, told him that "when you sent that letter [addressing the allegedly withheld commissions], everything changed," and "the reality is you can't continue to work for a company you're suing."  Pl.'s Resp. to SOF (PRSOF) at 42 (Dkt. #134).  Iellimo's words notwithstanding, and despite Meschino's filing of this lawsuit on January 8, 2015, he remained employed at Frazier for another six months.  As Meschino recalls it, he was ordered to report to headquarters in New Jersey on six different occasions for meetings that were

"unnecessary . . . [and requested] at odd times." *Id.* at 45. When he asked Kevin Lonsdorf, Frazier's Eastern Regional Manager, whether these meetings were a trap to acquire grounds to fire him, Lonsdorf allegedly told him, "you're a smart guy, [John], you can figure it out." *Id.*

On June 25, 2015, Maines emailed Frazier requesting the removal of Meschino as its account representative. *See* Oliver Aff. II (Dkt. #141-2, Ex. C). Frazier terminated Meschino on July 9, 2015. Oliver allegedly (he denies it) told Meschino at the termination meeting that he "felt like he was funding" Meschino's case against the company. PRSOF at 46. Following his termination, Meschino amended his Complaint to include a claim for retaliation. Meschino now seeks summary judgment on his Wage Act, breach of contract, and unjust enrichment claims. Frazier seeks summary judgment on all claims.

## DISCUSSION

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the

potential of affecting the outcome of the case." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citation omitted).

**Wage Act Claims for Withheld and Late Commissions**

Meschino contends that Frazier violated the Massachusetts Wage Act by: (1) taking deductions from his eligible commissions to recover 25% of the losses incurred on the Maines and Fresenius projects; (2) making commission payments after the date promised by his Employment Agreement; and (3) refusing to pay commissions on the Maines and Fresenius sales.

The Massachusetts Wage Act provides that "in no event shall wages remain unpaid by an employer for more than six days from the termination of the pay period in which such wages were earned by the employee." Mass. Gen. Laws ch. 149, § 148. "Earned" is not statutorily defined, but has been interpreted as describing the moment "[when] an employee has completed the labor, service, or performance required of him." *Awuah v. Coverall N. Am., Inc.*, 460 Mass. 484, 492 (2011). Commission payments vest "when the amount of such commissions, less allowable or authorized deductions, has

been definitely determined and has become due and payable to such employee." Mass. Gen. Laws. ch. 149, § 148. "Definitely determined" means "arithmetically determinable" under the terms of the employee's compensation plan. *McAleer v. Prudential Ins. Co. of Am.*, 928 F. Supp. 2d 280, 287 (D. Mass. 2013). "When a compensation plan specifically sets out the contingencies an employee must meet to earn a commission, courts apply the terms of the plan." *Id.* at 289. There is, however, an important "but": "No person shall by a *special contract* with an employee or by any other means exempt himself [from the timely payment of wages to employees]." Mass. Gen. Laws. ch. 149, § 148 (emphasis added). Although the Wage Act does not define "special contract," the Supreme Judicial Court (SJC) has interpreted the statute as banning any arrangement that would deduct or withhold payment of earned wages, even where the employee has given his assent. *Camara v. Attorney Gen.*, 458 Mass. 756, 760-761 (2011). This "special contracts" prohibition implicates the first Wage Act issue in this case – whether Frazier's deductions from Meschino's unrelated commissions to offset 25% of the losses allegedly incurred on the Maines and Fresenius projects violates the "special contract" prohibition.

Meschino argues that because the Employment Agreement defines commission payments on a project-by-project basis, Frazier is hoist on its

own petard. *See Am.'s Growth Capital, LLC v. PFIP, LLC*, 73 F. Supp. 3d 127, 150 (D. Mass. 2014) ("As a general rule, where there is ambiguity in a contractual term, the writing will be construed against its drafter."). Frazier counters that while "[it] deducted from Meschino's [other, unrelated] eligible commissions for the errors on the Fresenius and Maines Paper Projects . . . [no] deductions were made from commissions that were 'due and payable.'" DRSOF ¶ 27. Whether this is correct or not depends on Frazier's insistence that Meschino's commissions were assessed as a lump sum at the end of each quarter. Def.'s Reply at 2 (Dkt. #146). In other words, because the amount of Meschino's commission was not arithmetically determinable until the earnings on Meschino's sales had been aggregated with the bookable losses in his quarterly portfolio, they were not yet wages "due and payable" under the Wage Act.

This argument is at odds with the plain meaning of the definition of earned commissions set out in the Employment Agreement. *See, e.g.*, PSOF, Ex. 1 at 2 ("Commission will be paid out at 50% of the commission payable in the first eligible period once the customer pays 50% or more of the order. . . . The commission margin payable will stay with the job until paid"). The deduction clause says nothing that amplifies, expands, or contradicts the definition. *See* PSOF, Ex. 1 at 3 ("In the event of an error clearly attributable

to the salesman, the company reserves the right to recover by deduction up to 25% of the cost caused by the error."). Had Frazier meant the result it now argues for, when drafting the Agreement it need only have inserted the phrase, "against the aggregate commission due at the end of the quarter," after the word "deduction." *See Brigade Leveraged Cap. Structures Fund Ltd. v. PIMCO Income Strategy Fund*, 466 Mass. 368, 378 (2013). It did not, and might well not have succeeded had it done so. *See Camara*, 458 Mass. at 761 (a contractual provision that allowed employees to take a reduction in wages in lieu of disciplinary action after a vehicular accident violated "the Wage Act's overarching policy of protecting employees' rights to wages."); *see also Awuah*, 460 Mass. at 497 (the Wage Act precluded an employer from deducting "liability-focused insurance costs" preemptively from employee wages). Frazier's deduction clause, as written, is an impermissible "special contract," whether or not Meschino agreed to it.

Meschino next contends that several of his commission payments in 2014 and 2015 were paid late. He bases this claim on the provision in his Employment Agreement that states: "Commission on a quarters' jobs will be first eligible to be paid at the latest by 4½ months after the quarter the sale is booked." PSOF, Ex. 1 at 2. Based on this section, he alleges four late payments:

- Q2 2014: The payment date as calculated under the Agreement would have been November 15, 2014, but he was not paid until November 26.

- Q4 2014: The payment date as calculated under the Agreement would have been May 15, 2015, but he was not paid until May 18.

- Q1 2015: The payment date as calculated under the Agreement would have been August 15, 2015, but he was not paid until September 24.

- Q2 2015: The payment date as calculated under the Agreement would have been November 15, 2015, but he was not paid until November 19.[3]

In this instance, it is Meschino who misreads the Employment Agreement. The Agreement does not promise that commissions will be paid on the barrel head 4½ months after the quarter in which they are booked. Rather, the provision defines the latest possible date on which the commission will become vested, or *eligible* to be paid. Actual payment is to occur partially "when a job is 50% or more paid by the customer," and then completely "[w]hen the job is paid in full." PSOF, Ex. 1 at 2. As Meschino has not offered

---

[3] Meschino also argues that the two extra payments he received – the $16,846.65 compensation for "mistaken deductions," and the $324.14 for withheld commissions – were late when he received them in February and May of 2015. With respect to the "mistaken deduction" reimbursement, Frazier concedes that the payment was untimely. The dispute over the timeliness of the $324.14 commission adjustment is simply too immaterial for the court to tax the parties with the burden of producing evidence one way or another (which neither has).

13

any evidence of client payments, the court has no basis to award him summary judgment on the late payments issue.[4]

Finally, Meschino complains that he should have been paid a commission on both the Maines and Fresenius sales. Meschino offers a chart produced by Frazier during discovery, FRAZ000113, which purports to detail those commissions. PSOF, Ex. 9 at 3. According to the chart, Meschino's original earned commissions totaled $10,970.86. *Id.* Even after allowing for a so-called "adjusted margin," the chart projects total commissions of $6,725.62. *Id.* Those commissions were then cancelled out by Frazier's claim of "extraordinary loss[es]." *Id.* Meschino argues that "Frazier's after-the-fact arithmetic gymnastics are due no weight, but rather its own admission that Mr. Meschino had earned commission on the Maines and Fresenius jobs that Frazier simply refused to pay compels summary

---

[4] In any event, the Wage Act provides that "[e]very person having employees in his service shall pay . . . the wages earned by him to within *six days* of the termination of the pay period during which the wages were earned." *See* Mass. Gen. Laws. ch. 149, § 148 (emphasis added). Two of the alleged late payments – Q4 2014 and Q2 2015 – were made within six days of the purported vesting date. Summary judgment will thus be awarded to Frazier with respect to these two payments. As for the other two "late" payments, Frazier has not offered any evidence of its clients' payment schedules or any justification for the "extra administrative time" or "key personnel" delay mentioned in the Acerra affidavit. Acerra Aff. ¶ 16 (Dkt. #141-3).

judgment in favor of Mr. Meschino on this claim." Pl.'s Mem. at 10 n.7 (Dkt. #119).

Frazier asserts that Meschino did not in fact earn commissions because neither the Maines nor the Fresenius project generated the requisite 10% profit margin. The Employment Agreement specified that "[f]or jobs approved [by Meschino's supervisors] with margins under 10% . . . ¼ of 1% of the total sell will be paid as a commission." PSOF, Ex. 1 at 2. Based on this provision, Frazier argues that "in cases where Frazier sustained a loss or the gross margin was below ten percent then no commission was due or payable." Def.'s Statement of Facts (SOF) ¶ 20 (Dkt. #113). The concept of "gross margin" appears to equate with the more usual term, "net profit," and Meschino does not disagree. *See* PRSOF at 9. The court sees nothing legally objectionable to an employer's conditioning of a commission on the profitability of a sale. While in setting hourly wages, an employer is constrained by state and federal minimum wage laws, there are no similar constraints on the fashioning of a commission structure. Meschino offers no evidence that the Maines or Fresenius projects yielded the required 10% net profit margin after costs. Nor does he offer evidence that he ever obtained the supervisors' approvals that would have qualified him for the alternative commission of ¼ of 1% of the total gross sale. Consequently, there is no basis

for an entry of summary judgment on this issue in his favor. Meschino also offers no factual rebuttal to Frazier's evidence that the profit margins on the Maines and Fresenius projects were -4.38% and -10.81% respectively. Consequently, summary judgment will enter on this issue for Frazier.[5]

**Retaliation Claim**

> The Massachusetts Wage Act provides that:
>
> [n]o employee shall be penalized by an employer in any way as a result of any action on the part of the employee to seek his or her rights under the wages and hours provisions of [Chapter 149] . . . [a]ny employer who discharges or in any other manner discriminates against any employee because such employee has made a complaint to the attorney general or any other person . . . shall have violated this section.

Mass. Gen. Laws. ch. 149, § 148A. To sustain a claim of retaliation, a plaintiff must establish a *prima facie* case by showing: (1) that the plaintiff engaged in legally protected conduct; (2) that he suffered an adverse employment action; and (3) that a "causal link" existed between the two events. *Mole v. Univ. of Mass.*, 442 Mass. 582, 591-592 (2004). When a plaintiff presents direct evidence of discrimination, the burden shifts to the defendant to show that a legitimate reason, standing alone, would have induced the employer

---

[5] Meschino's alternative claim of breach of contract fails because there was no contract. It is undisputed that he was an at-will employee. Similarly, his unjust enrichment claim fails because he has a remedy at law under the Wage Act. *See Santagate v. Tower*, 64 Mass. App. Ct. 324, 329 (2005).

to take the same adverse action.  *Finney v. Madico, Inc.*, 42 Mass. App. Ct. 46, 49 n.5 (1997), citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

Massachusetts is a "pretext only jurisdiction."  *Blare v. Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 443 (1995).  Meschino may therefore "survive summary judgment by producing evidence 'that the respondent's facially proper reasons given for its action against him . . . were not the real reasons for that action' . . . even if that evidence does not show directly that the true reasons were, in fact, discriminatory."  *Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.*, 474 Mass. 382, 397 (2016) (internal citations omitted).  Although Meschino bears the burden of production, Frazier has the final burden of persuasion as the moving party on summary judgment.  *See Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 683 (2016).

Frazier contends that Meschino cannot establish a *prima facie* case because he fails to demonstrate that his litigation was the "but for" cause of his termination.  Def.'s Mem. at 17, quoting *Mogilevsky v. Wellbridge Club Mgmt., Inc.*, 905 F. Supp. 2d 405, 412 (D. Mass. 2012).  Frazier argues that the nearly twelve-month gap between Meschino's first inquiry about withheld commissions and his actual termination makes the retaliation

claim too attenuated. Instead, Frazier wheels up a litany of reasons for Meschino's termination – poor job performance, failure to improve, and client complaints and requests for his removal – any one of which might prove persuasive to a jury. But under Massachusetts law, Meschino need show only some causal connection between the protected activity and his termination. A "but for" showing is not required. *See Mole*, 442 Mass. at 591-592; *cf. Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013). Here Meschino's showing of causation is part and parcel of his direct evidence of retaliation. His testimony about repeated comments made by company officials (including Frazier's president) who were aware of his lawsuit – for example, "the reality is you can't continue to work for a company that you're suing," *see* PRSOF, Ex. E at 547, "you're a smart guy, [John], you can figure it out," *id.* at 45, Oliver's comment that "[he] felt like he was funding [Meschino's lawsuit]," *id.* at 46 – if believed by the jury would warrant a verdict on the retaliation claim in his favor.

ORDER

For the foregoing reasons, Meschino's motion for summary judgment on the Wage Act deductions issue and the late payment of the $16,846.64 reimbursement for mistaken deductions is <u>ALLOWED</u>. Frazier's motion for summary judgment on the Maines and Fresenius commission claims, the

breach of contract claim, and the unjust enrichment claim is <u>ALLOWED</u>. Frazier's motion for summary judgment on the retaliation claim is <u>DENIED</u>. The Clerk will set this remaining claim for trial.[6]

                                  SO ORDERED.

                                  /s/ Richard G. Stearns

                                _____
                                UNITED STATES DISTRICT JUDGE

---

[6] Precise money damages remain to be determined, but it would appear based on the statutory formula that Meschino will be entitled to treble damages, as well as 12% interest and attorneys' fees. *See* Mass. Gen. Laws. ch. 149, § 150 ("The defendant shall not set up as a defence [sic] a payment of wages after the bringing of the complaint . . . . An employee so aggrieved who prevails in such an action shall be awarded treble damages, as liquidated damages, for any lost wages and other benefits and shall also be awarded the costs of the litigation and reasonable attorneys' fees."); *see also* Mass. Gen. Laws. ch. 231, § 6C ("In all actions based on contractual obligations . . . interest shall be added by the clerk of the court to the amount of damages . . . at the rate of twelve per cent per annum.").